**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

SHERRY MCDANIEL and
PATRICIA WILLIFORD                                                PLAINTIFFS

VS.                                      NO. 3:05CV00018 WRW

SANYO MANUFACTURING CORP.                                DEFENDANT

<u>**ORDER**</u>

Pending is Defendant's Motion for Summary Judgment.[1]  The Plaintiffs have

responded.[2]  For the reasons stated below, Defendant's Motion for Judgement on the claim of

Separate Plaintiff Sherry McDaniel is GRANTED.   Defendant's Motion for Summary

Judgement on the claim of Separate Plaintiff Patricia Williford is DENIED.

The Plaintiff's allege sexual harassment in violation of Title VII of the Civil Rights Act.

The Plaintiffs' allegations include harassment in the form of a hostile work environment claim,

and a *quid pro quo* claim.  Plaintiff, McDaniel ("McDaniel") contends that she was subjected to

a hostile work environment during the years she worked on Defendant's assembly line, where

she observed inappropriate conduct between male and female workers.  Separate Plaintiff,

Williford ("Williford") contends she was subjected to sexual harassment by a group leader and

by the production manager, and that she was terminated during her probationary period because

she refused to provide untoward favors to the production manager.[3]

---

[1]Doc. No. 7.

[2]Doc. No. 14.

[3]Doc. No. 1.

1

The Defendant denies Plaintiffs' allegations, and it contends that Plaintiffs didn't avail themselves of a sexual harassment procedure under its established policy.   Defendants maintain that the harassment of McDaniel was not so severe that it altered the condition of her employment.   Defendants contend that Williford was terminated for legitimate, nondiscriminatory reasons; and that the supervisor who allegedly requested personal favors from Williford did not make the decision to terminate her.

## I. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[4]   The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[5]

The Eighth Circuit has cautioned that summary judgment is an extreme remedy that should only be granted when the movant has established a right to the judgment beyond controversy.[6]   Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[7]   I must view the facts in the light most favorable to the party opposing the motion.[8]

---

[4]*Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed R. Civ. P. 56.

[5]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[6]*Inland Oil & Transport Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[7]*Id.* at 728.

[8]*Id.* at 727-28.

The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, "[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact.  It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion.  Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue.  If the respondent fails to carry that burden, summary judgment should be granted.[9]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[10]

## II.  Discussion

In a sexual harassment suit, a plaintiff must show: (1) membership in a protected group; (2) the occurrence of unwelcome harassment; (3) a connection between the harassment and membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment.[11]

The terms "q*uid pro quo*" and "hostile work environment" are used to illustrate the distinction between harassment claims involving a threat that is carried out and offensive conduct in general.  *Quid pro quo* harassment occurs when a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands.  When *quid pro quo* harassment takes place, the tangible employment decision itself constitutes a

---

[9]*Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988).

[10]*Anderson*, 477 U.S. at 248.

[11]*Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999).

change in the terms and conditions of employment.  But, when there is no such tangible action, a plaintiff must demonstrate that the conduct was severe and pervasive.[12]

Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation and ridicule.[13]  The work environment should be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[14]  Relevant factors to determine whether conduct rises to the level of abusiveness include frequency, severity, and whether the conduct is physically threatening or humiliating.[15]

Abuse directed at a third party can be part of the picture of harassment, but it is less significant.[16]  Such abuse is generally only relevant to corroborate alleged direct harassment.[17] Sexual harassment of others will also augment allegations of *quid pro quo* harassment.[18]

An employer is vicariously liable to a victimized employee for a hostile work environment claim involving a supervisor with "immediate or successively higher authority

---

[12]*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

[13]*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations omitted and emphasis added).

[14]*Faragher v. City of Boca Raton*, 524 U.S. 786,  787 (1998).

[15]*Harris*, 510 U.S. at 23.

[16]*Hocevar v. Purdue Frederick Company*, 223 F.3d 721, 741 (8th Cir. 2000).

[17]*Hall v. Gus Construction Co. Inc.*, 842 F.2d 1010, 1015 (8th Cir. 1988); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995); *Black v. Zaring Homes, Inc.* 104 F.3d 822, 826 (6th Cir. 1997); *Gleason v. Mesirow Financial, Inc.* 118 F.3d 1134, 1144 (7th Cir. 1997).

[18]*Hocevar*, 223 F.3d at 741 (quoting *Hall*, 842 F.2d at 1015); *See Howard v. Burns Bros. Inc.*, 149 F.3d 835 (8th Cir. 1998).

over the employee."[19]  Vicarious liability is imposed because the employer gives supervisors power to hire and fire, to set work schedules, and to set pay rates.[20]

When no tangible action is taken, an employer has an affirmative defense if it exercised reasonable care to prevent sexually harassing behavior, and if the employee unreasonably failed to take advantage of the employer's preventative measures.[21]  The employer bears the burden of showing that the victim unreasonably failed to take available steps to reduce the harm from the harassment.[22]  However, no such affirmative defense is available when the supervisor's harassment leads to termination.[23]

**A.  Hostile Work Environment Claims:**

McDaniel began working for Defendant in January 1978.[24]  She did not suffer a tangible change in her working conditions, and McDaniel admits that no sexual harassment was directed at her.[25]  However, McDaniel believes that she was subjected to a hostile work environment because she witnessed or heard about continuous sexual misconduct in the workplace.

According to  McDaniel, the main culprit is Mr. Don Holliman, ("Holliman"), the production

---

[19]*Faragher*, 524 U.S. at 807.

[20]*Id.* at 803.

[21]*Id.*

[22]*Okruhlik v. University of Arkansas*, 395 F.3d 872, 880 (8th Cir. 2005).

[23]*Faragher,* 524 U.S. at 808.

[24]Defendant Ex. A, p. 10.

[25]Defendant Ex. A, p. 13.

manager for Defendant.  McDaniel saw Holliman engage in inappropriate touching[26] and heard him make crude remarks.[27]  Other females reported harassment by Holliman to McDaniel.[28]

McDaniel witnessed Holliman allegedly making unwelcome sexual advances to female workers, and also saw Holliman engage in consensual sexual relationships with females he supervised.[29]  McDaniel also described misconduct of two other male workers -- a group leader and a line supervisor.[30]  McDaniel attributed the general misbehavior in the workplace to Holliman, because he set a poor example and lacked respect for the company.[31]

The behavior described by McDaniel may raise an inference that the workplace was "out of hand."[32]  However, offensive conduct was not directed at McDaniel.  Under *Hocevar*,[33] abuse directed at a party other than a plaintiff is not as significant, and is not as likely to affect a term or condition of employment.   McDaniel witnessed six incidents and was told about nine other incidents.  Four of the incidents described by McDaniel were consensual.

---

[26]Defendant  Ex. A., p. 15 (lines 7-10); p. 6 (lines 1-2);  p. 17 (lines 1-4).

[27]Defendant Ex. A., p. 18 (lines 14-22); p. 19 (lines 3-4).

[28]Defendant Ex. A, p. 33 (lines 17-18) (a female worker reported a crude remark made by Holliman); p. 28 (lines 12-14) ( it was reported to McDaniel that Holliman asked a female supervisor for personal favors).

[29]Defendant  Ex. A, p. 22 (lines 24-25); p. 23  (lines 1-10); p. 26  (lines 2-9).

[30]Defendant Ex. A, p. 20 (lines 5-12) ( McDaniel witnessed supervisor Curtis Anderson fondling a female worker); p. 32 (lines 9-12) (female worker reported to McDaniel that group leader, Keenan Bradley, showed her his penis); p. 33, (line 3-7) (a female worker reported to McDaniel that supervisor Keenan Bradley had rubbed against her); p. 30 (lines 24-25) p.31(lines 1-4) (female worker reported to McDaniel that Keenan Bradley had grabbed and kissed her).

[31]Defendant Ex. A, p. 22 (lines 1-3).

[32]Defendant Ex. A, p. 21 (line 10).

[33]721 F.3d at 741 (quoting *Gleason,* 18 F.3d at 1144-45).

In view of this, the alleged harassment experienced by McDaniel was not so severe as to reasonably create an inference that it changed her employment, and interfered with her ability to do her job.  Taking all the allegations of McDaniel as true, she has failed to create a genuine issue that she was subjected to a work environment so permeated with abuse that a reasonable person would find it intolerable.

Williford alleges a hostile work-environment claim with no tangible action.  These are the allegations involving Mr. Kennan Bradley ("Bradley").  According to Williford, Bradley called her sexy, whistled at her, made comments about her "boobs" and attempted to grab her butt while exclaiming "ooh mama."[34]

 Bradley did not have the power to hire or fire Williford, and his comments were not conditioned on any threat or promise.  So, this part of Williford's claim cannot be considered *quid pro quo* sexual harassment.  However, a jury could reasonably conclude that Bradley's alleged behavior was humiliating, and, therefore, severe enough to alter Williford's work environment.

Because there is no tangible action connected to this part of Williford's claim, she must show that she acted reasonably to stop the harassment. Williford admits that she did not report Bradley.  However, there is sufficient information presented from which a jury may believe that the Defendant knew or should have known about Bradley's inclination to harass females.  There is testimony that Bradley's misconduct was reported to management, and that Bradley openly harassed several other women.[35]  The Defendant's plant was described by one worker as a

---

[34]Plaintiff Ex. C, p. 23 (lines 5-15) p. 24 (lines 3-4).

[35]Plaintiff Ex. O, p. 40 (lines 6-8) (the conduct of Bradley was reported to the personnel department on several occasions and requests to see upper management were refused); p. 46

"small community."[36]  From such testimony, it could be reasonably inferred that the alleged

misbehavior of members of this "small community" had come to the attention of management.

So, there is enough evidence to support a finding that management failed to exercise reasonable

care to prevent and correct the conduct alleged in this case.

In addition, a jury may conclude that Williford acted reasonably when she failed to

report Bradley.  While Bradley did not hold the power to hire and fire, he was a group leader.[37]

Bradley testified that he was responsible for the work performance of every employee.[38]  Based

on this testimony, an inference arises that Bradley possessed enough power to intimidate and,

therefore, silence Williford.

Williford testified that her supervisor, Ms. Ramsay, ("Ramsay") was aware that the

production manager, Holliman, wanted "special favors" from Williford, that did not include

working overtime. In spite of this, Ramsay did nothing to protect Williford.   From this, a jury

may conclude that Williford reasonably assumed that if the sexual harassment of a production

manager was tolerated, then sexual harassment from a group leaders would also be tolerated.

In fine, a policy printed in a handbook does not prove, as a matter of law, that an

---

(lines 6-19) (Bradley was observed hounding a female employee until she gave in to his
demands; he was seen putting his hands down the pants of this same female worker); Plaintiff
Ex. P, p. 15 (lines 5-6) p. 16, (lines 1-5)  p. 21  (lines 3-18)(Bradley was seen grabbing the
buttocks area of a female worker with both hands exclaiming that "this is mine," he was seen
pulling his pants tight enough to reveal the outline of his penis to female workers; he exposed
himself to a worker during a lunch break), p. 42 (lines 8-25) p. 43 (line 1) (Bradley's overall
behavior was reported to a union representative); Plaintiff Ex. M, p. 8 (lines 18-25) p. 9 (lines 1-
9) p. 11 (lines 10-12)(Bradley made numerous advances, including touching and kissing despite
being told that such conduct was unwanted).

[36]Plaintiff Ex. O, p. 7 (lines 3-8).

[37]Plaintiff Ex. C, p. 21 (line 17).

[38]Plaintiff Ex. E, p. 18 (line 18).

employer takes reasonable action to prevent sexual harassment. In this case, a jury must weigh all the disputed material facts and decide if Defendant is entitled to an affirmative defense because it took preventative measures.

## B. *Quid Pro Quo* Harassment:

To raise an inference of *quid pro quo* harassment, a plaintiff must show:  (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances; (3) the harassment was based on her sex, and; (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.[39]

The Plaintiff must also show a connection between the adverse action and the alleged harasser.[40]   In other words, Williford has to produce sufficient evidence to reasonably convince a jury that Holliman conditioned her employment on submission to his unwelcome sexual advances, and he played a part in her termination because she refused him. The evidence and testimony set out below, create a reasonable inference of *quid pro quo* harassment.

 Williford was terminated because of "job performance and eating on the line."[41] However, she received positive marks about her work until the day she was fired.[42]  With respect to the charge of "eating on the line," there is indication that it was not a significant offense.   There is

---

[39]*Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1066 (8th Cir. 2000).

[40]*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999); *Williams v. Vorizon Washington, D.C., Inc.*, 266 F. Supp. 2d 107 (D.D.C. 2003).

[41]Plaintiff Ex. H attachment to deposition (Employee Hire or Status Change Notice).

[42]Plaintiff Ex. G, p. 7 (lines 1-7); Plaintiff  Ex. H attachment to deposition (work evaluations).

testimony that Holliman peeled apples for a favored female to eat while working on the line;[43] and Ramsay testified that it was unusual for an employee to be fired for eating on the line.[44]

There is also enough evidence to create a reasonable suspicion that there was a link between Holliman's requests for favors and Williford's termination.  Williford testified that Holliman reminded her that he could fire her at the same time he asked if she "fooled around."[45] There is testimony from a third person who overheard Holliman ask Williford to be "very, very nice" to him.  According to the same testimony, this request was made on the day Williford was terminated.[46]

It was Holliman who brought Williford's job performance to the attention of her immediate supervisor, Ramsay.[47]  Up to the day of termination, Ramsay had no complaints about Williford's work.[48]  Holliman had supervisory authority over Ramsay when he made her aware of Williford's poor work performance.[49]  After Holliman spoke to Ramsay, both Ramsay and Holliman notified the human resource manager, Ms. Suzanne Aunspaugh("Aunspaugh").

---

[43]Plaintiff Ex. D, p. 26 (lines 2-6); Plaintiff Ex. L, p. 6 (line 22).

[44]Plaintiff Ex. G, p. 19 (lines 17-22).

[45]Defendant Ex. C, p. 18 (lines 5-8); and  p.20 (lines 12-14).

[46]Plaintiff Ex. P, p. 12 (lines 20-25) and  p. 13 (lines 1-10).

[47]Plaintiff Ex. G, p. 8 (lines 1-4);  Plaintiff Ex. I, p. 11 (lines 5-6); Plaintiff Ex. C,  p. 15, (lines 5-13).

[48]Plaintiff Ex. G, p. 7 (lines 2-19).

[49]Plaintiff Ex. C,  p. 17 (line 15-18); Plaintiff  Ex. G, p. 8 (line 2).

Holliman remained in close proximity to Aunspaugh and Ramsay during the time they were directed by him to watch Williford while she worked.[50]

Defendants contend  it is beyond dispute that Aunspaugh independently came to the conclusion to fire Williford.  However, a jury could reasonably conclude that, as the production manager, Holliman's input on worker performance would carry great weight.  Ramsay testified that Holliman possessed the power to override decisions of the personnel department.[51]  From all of this, a jury could decide Holliman played a pivotal role in Williford's discharge.

There is conflicting evidence about Williford's work performance.   The written evaluations demonstrate that she was a good, dependable worker.  However, according to the testimony of Holliman, Ramsay, and Aunspaugh, Williford's work habits took a sudden turn for the worse.[52]  This turn of events took place on the same day that Holliman was overheard asking that Williford be "very, very, nice" to him.

 Finally, there are conflicts in the testimony of Bradley, Ramsay, Aunspaugh, and Holliman about the events that took place on the day Williford was fired.[53]  An example is that Holliman testified he did not see Williford eating on the line, but Ramsay testified that Holliman brought it to her attention.[54] Another example involves the color patterns on Williford's television screens.  Holliman testified that Williford's screens were blue as they passed her station.  According to Holliman this was solid evidence that Williford was not doing

---

[50]Plaintiff Ex.  F,  p. 29 (lines 1-24).

[51]Plaintiff Ex. G,  p. 24 (lines 9-12).

[52]Plaintiff Exs. F, G, and I.

[53]Plaintiff Exs. E, F, G and I.

[54]Plaintiff Ex. F, p.18 (lines 6-12);  Plaintiff  Ex. G, p. 7 (line 20-25).

her job.  On the other hand,  Ramsay testified that Williford's television screens should have had a "blue field"as they went down the line.[55]  So, a jury may infer that conflicting testimony demonstrates the employer is covering up the real reason for Williford's termination.

Without rehashing all the testimony, there is evidence that raises a reasonable suspicion of an alleged pattern of harassment by Holliman.[56]  Such testimony augments Williford's allegation that he harassed her. Thus, there is ample evidence from which a jury might conclude that Williford was a victim of Holliman's sexual harasment.

Defendant's Motion for Summary Judgment on the claim of Separate Plaintiff Sherry McDaniel is GRANTED.   Defendant's Motion for Summary Judgment on the claim of Separate Plaintiff Patricia Williford is DENIED.

IT IS SO ORDERED this 11th day of January 2006.


/s/ Wm. R.Wilson,Jr.
UNITED STATES DISTRICT JUDGE

---

[55]Plaintiff Ex. F, p. 11 (lines 3-6); Plaintiff Ex. G p. 14 (lines 1-6).

[56]Plaintiff Ex. D (deposition of Ms. McDaniel); Plaintiff Ex. J (deposition of Linnie Kimble); Plaintiff Ex. M (deposition of Sheila Taylor); Plaintiff Ex. N (deposition of LaBelle Hodges); Plaintiff Ex. O (deposition of Curtis Hodges).